**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

01 FEB 26 PM 4: 22


CLERK ALBUQUERQUE

FIRST SECURITY BANK OF
NEW MEXICO, N.A.,

       Plaintiff

vs.

       Cause No. CIV-94-1464 LH/WWD

PAN AMERICAN BANK; 1ST STATE
INVESTMENT CO, INC.; MATHER
FEDERAL CREDIT UNION; JOHN P.
McGOVERN FOUNDATION,

       Defendants.

## FIRST SECURITY BANK'S REQUESTED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff First Security Bank of New Mexico N.A. (FSB) respectfully request the Court to

adopt the following Findings of Fact and Conclusions of Law:

## REQUESTED FINDINGS OF FACT

**A.**    **Jurisdictional Facts**

     1)    FSB is a national banking association duly organized and existing under the laws

of the United States of America, with its principal place of business in Albuquerque, New Mexico.

     2)    PanAmerican Bank is a Florida banking corporation with its principal place of

business in Miami, Florida.

     3)    Beatrice Stonebanks ("Stonebanks") incorporated, and was the President of,

Benjamin Maxwell & Co. Corp. ("Benjamin Maxwell").

     4)    In this action, the matter in controversy exceeds the sum or value of $75,000,

exclusive of interest and costs.

5)      This action is between citizens of different states.

6)      The original Complaint for Interpleader named more than two adverse claimants of diverse citizenship as defined in 28 U.S.C. § 1332, who claimed to be entitled to the money in the custody or possession of FSB, or to the proceeds of the account obligation of FSB, which was the subject of the interpleader.

7)      On December 22, 1994, simultaneously with the filing of the Complaint for Interpleader, FSB deposited $305,877,12 with the Registry of this United States District Court.

8)      On March 12, 1996, this Court entered an order dismissing the interpleader and disbursing the interpleader funds. The Court's March 12, 1996, Order was approved by all parties.

9)      Except for claims explicitly dismissed by the March 12, 1996, Order, all other claims and defenses, including the counterclaims of PanAmerican, and claims by and against FSB, were preserved.

**B.      Stonebanks relationship with CIC; CIC's relationship with PanAmerican**

10)      PanAmerican served as a custodian bank for CIC and typically executed wire transfers, such as the PanAmerican Wire, for its customer CIC.

11)      PanAmerican Bank and CIC had a common owner, Interbank Holding Company, owned by the Ortega brothers, citizens of Equador.

12)      CIC was in the business of purchasing directly, or through brokers, CDs from banks or financial institutions.

13)      Brokers such as Beatrice Stonebanks were paid commissions by CIC for finding bank CDs or any similar types of brokered deposits for CIC to buy.

14)      Stonebanks had a long existing relationship placing brokered CDs for CIC Capital ("CIC") beginning at least as early as July, 1991.

15)   CIC required an account number in a wire transfer instruction to PanAmerican.

16)   CIC, out of about 600 transactions each month, usually only had very occasional CD buyback requests.

17)   During July 1994, CIC had approximately 7 CD buyback requests from Stonebanks.

## C.   Origination of the PanAmerican Wire to FSB

18)   On August 3, 1994, Stonebanks on behalf of Benjamin Maxwell opened a business savings account at FSB, to which FSB assigned account number 033015363.

19)   Stonebanks titled account number 033015363:

> BENJAMIN MAXWELL & CO. CORP.
> JUMBO CD ACCOUNTS

20)   On or about August 3, 1994, Stonebanks contacted Tony Romero at CIC and advised that Benjamin Maxwell could place (broker) for CIC certificates of deposit ("CDs") at FSB.

21)   Neither CIC nor PanAmerican attempted to contact FSB directly before the wire was sent.

22)   Neither Stonebanks nor Benajamin Maxwell was ever authorized to represent FSB in any capacity to broker or quote rates for CDs.

23)   Mr. Romero had bought thousands of CDs through brokers over the years.

24)   Mr. Romero estimated he had bought 50 to 100 CDs from Beatrice Stonebanks.

25)   Beatrice Stonebanks forged a First Security Bank employee's name (Delores Jones) on a confirmation form and furnished the wire instructions to CIC, which were as follows:

> "wire to:      First Security Bk
>                formerly FNB in ABQ
>                Albuquerque, NM
>                aba # 1070-0027-5
>                credit Jumbo CD Accounts
>                Account # 033015363

26)     Neither CIC nor PanAmerican attempted to contact FSB to verify any of the CD or wire information provided by Stonebanks on behalf of Benjamin, Maxwell.

27)     Outgoing wire transfer instructions (payment orders) for CD purchases were made by CIC on a PanAmerican Bank form called "Request for Wireout Transfer" or "RFWT".

28)     PanAmerican's outgoing wire procedures included the specific requirement that the customer provide an account number for the wire beneficiary on the "RFWT."

29)     PanAmerican's outgoing wire procedures further included the specific requirement that its Account Officer make sure the wire request included a beneficiary account number.

30)     An outgoing wire request was not considered complete by CIC or by PanAmerican if the beneficiary account number was not included.

31)     The PanAmerican "RFWT" form contained a separate box for the Beneficiary description.

32)     CIC provide the Beneficiary information in all "RFWT" forms.

33)     CIC specified the Beneficiary of the PanAmerican Wire was: "First N.B. of Albuquerque Account No. 033015363."

34)     CIC also designated in the Special Instructions section of the RFWT for the PanAmerican Wire: "To Beneficiary (BNF) Credit Jumbo CD Account."

35)     The Master Trade Account form for the PanAmerican Wire was a PanAmerican form document that was completed by CIC employees.

36)     CIC's direction to PanAmerican was for the wire to be credited to account number 03315363, the Jumbo CD Account, the account number provided to PanAmerican.

37)     CIC knew and expected that the PanAmerican Wire would be credited to Account Number 033015363.

4

38)    CIC incorrectly assumed, based on representations from Beatrice Stonebanks that Account Number 033015363 was an account number belonging to FSB rather than to Benjamin Maxwell.

39)    CIC had no suspicion of improper transactions by Beatrice Stonebanks until after the date of the PanAmerican Wire.

40)    PanAmerican intended and expected that, based on CIC's wire instructions, that the $495,000.00 wire would be credited to account number 033015363 at FSB.

41)    At the time PanAmerican Bank sent the wire, it had no knowledge as to who was the actual owner of FSB account number 033015363.

42)    Because PanAmerican Bank did not receive any rejection message for the wire through the fed wire system, it believed and concluded that the PanAmerican Wire was in fact deposited into the account number listed as the beneficiary.

43)    Prior to issuing the PanAmerican Wire instruction, CIC did not contact anyone at FSB.

44)    CIC purchased from various financial institutions, at least 189 CDs brokered by Beatrice Stonebanks/Benjamin Maxwell between July 1991 and November 1994.

D.    **FSB's Wire Transfer System and Procedures**

45)    Two separate computer systems were used in the FSB wire department.

46)    The incoming wire desk in the FSB wire department had two separate, dedicated computer terminals, one for the WireNet system, and the other for the CICS system.

47)    One computer terminal was used only to receive wire transfers used the WireNet automated software system which interfaced with Fedwire (the Federal Reserve's automated wire transfer software system).

5

48)     The second computer system at the incoming wire desk accessed FSB's internal customer account computer system, the "CICS" system.

49)     Incoming wires were received and accepted only on the WireNet automated wire system computer.

50)     FSB's procedure was to rely solely on an account number as the beneficiary if an account number was specified in the wire.

51)     FSB wire operators were trained to rely solely on the WireNet system to accept incoming wires which contain a valid account number in the beneficiary field.

52)     The WireNet software makes payment of incoming wires a semi-automated system.

53)     At the moment a wire was accepted (paid) by FSB the funds are instantly credited to the beneficiary account.

54)     Only one FSB wire operator at a time received incoming wires.

55)     When an incoming wire was received by WireNet, a hard copy of the wire instructions is printed automatically.

56)     The FSB wire room had a dedicated printer which printed only copies of incoming wires and that printer was next to the incoming wire desk.

57)     When incoming wire(s) was received, an FSB employee would remove from the printer hard copies of all incoming wires then printed, and take the hard copy(ies) to his/her work station.

58)     Incoming wires waiting in the queue to be accepted would be displayed on the monitor by striking the "F6" key on the WireNet computer keyboard.

59)     The input operator would input (accept) waiting incoming wires in the order received.

6

60)     The operator who processed (accepted) the incoming wire initialed the wire copy immediately after accepting the wires.

61)     To accept (pay) an incoming wire, the wire operator would strike the "F6" key on the WireNet computer keyboard, then enter the four (4) digit department code (4200), and then strike, "F1" and "A".

62)     When the operator struck the "F6" command key the WireNet terminal displayed the next incoming wire.

63)     The operator would then type "4200" and strike the keys "F1" and "A".

64)     It took only a few seconds for the wire operator to enter those keystrokes and accept (pay) the wire.

65)     Without human interaction, WireNet verifies that the beneficiary account number identified in the wire instruction matches an account number at FSB and ignores any named beneficiary.

66)     If the beneficiary account number in an incoming wire was a valid FSB account number (whether an internal FSB account or customer account), the wire was accepted and instantly credited into the designated account by the WireNet software.

67)     If the beneficiary account number in the wire instruction was not a valid account number, the WireNet software displayed an error message and the wire was not automatically accepted.

68)     After being accepted by an input operator, each wire was reviewed by a second wire department employee to verify that the wire was credited to the beneficiary account number designated.

69)     The reviewer then initialed the wire copy.

7

70)     As a separate customer service, FSB would attempt to make a courtesy call to a customer to advise the customer that a wire had been received and that the funds were available in the account.

71)     FSB's policy and procedure was to place the courtesy call after the incoming wire was accepted.

72)     Courtesy calls to FSB customers who received frequent or numerous wires were often on speed dial on its telephone system.

73)     FSB's procedure was to note the time and the person to whom to courtesy call was made.

74)     At FSB, account numbers beginning with zero could be FSB's internal accounts as well as customer accounts.

75)     At FSB, wire department employees were not involved in determining the owner of an account number.

76)     At FSB, account numbers with 9 digits could include both FSB's internal accounts and customer accounts.

E.     **Receipt and Acceptance of the PanAmerican Wire**

77)     The PanAmerican Wire was paid (accepted) solely on the basis of the valid beneficiary account number contained in the wire.

78)     There is no evidence that Quintana recognized or was aware of any conflicting beneficiary information in the PanAmerican Wire before accepting the wire.

79)     According to FSB wire department procedure, Bobby Quintana's initials on the upper left hand corner of the wire indicated he processed (accepted) the PanAmerican Wire.

80)   On August 3, 1994, at the time the PanAmerican Wire was received by FSB, the WireNet system verified that account number 033015363 was a valid account number.

81)   The PanAmerican Wire was accepted by FSB employee Bobby Quintana ("Quintana") without any indication that he was aware of any conflicting beneficiary information.

82)   FSB procedure, and the practice of Quintana, was to make the courtesy call to a customer after the wire was accepted.

83)   If, at the time the PanAmerican Wire was accepted, Bobby Quintana had used the CICS system to obtain information to make a courtesy call, such information was not available on that system.

84)   Quintana could not use the Bank's CICS system information to obtain information to make a courtesy call on a new account because no information other than the account number was available on the system until the next business day after the account was opened.

85)   Nancy Abeyta was a supervisor in the FSB wire department on August 3, 1994.

86)   Nancy Abeyta remembered Bobby Quintana bringing a hard copy of the PanAmerican Wire to her and requesting that she make the courtesy call to notify the customer the wire had been received and accepted.

87)   At the time Quintana brought the PanAmerican Wire to Nancy Abeyta, it already contained his initials and a second set of initial indicating the wire had also been reviewed.

88)   Bobby Quintana brought the PanAmerican Wire to Nancy Abeyta approximately 20 minutes after it had been accepted.

89)   Bobby Quintana asked Nancy Abeyta to make the courtesy call because he could not locate customer contact information for the new account and could not make the courtesy call himself.

9

90)     Quintana's practice when inputting incoming wires was to tear off from the dedicated printer the hard copy of all wires waiting for input.

91)     It was not uncommon for numerous wires to be waiting on the printer.

92)     Quintana's desk was approximately three feet from the incoming wire printer.

93)     Quintana would turn in his chair, reach over, and remove wire copies from the printer.

94)     Quintana would not necessarily even have to stand up to reach wires on the printer.

95)     Quintana would normally make a courtesy call sometime after the wire was input.

96)     If Quintana used the CICS system to look up an account number, and that system showed that the account number was new that day, that information would not cause him to question the wire.

97)     Quintana estimated that at the time of the PanAmerican Wire, FSB averaged around 180 to 230 incoming wires per day.

98)     On August 3, 1994, FSB received 162 incoming wires.

99)     The PanAmerican Wire was the 133rd wire received that day at 2:22:57 p.m.

100)    32 wires were received by FSB in the hour preceding the PanAmerican Wire, 17 of those wires between 2:00 p.m. and 2:22:57 p.m.

101)    There were three other incoming wires received by FSB less than one minute before the PanAmerican Wire.

102)    On August 3, 1994, FSB received incoming wires as large as $22,000,000 including 44 wires in amounts of $500,000 or more.

103)    If Quintana had recognized that a wire included First National Bank of Albuquerque as a beneficiary but also a customer savings account was a beneficiary, he would have investigated further before accepting the wire.

104)    When Bobby Quintana brought the wire to Nancy Abeyta, Abeyta called Ken Henz, manager of the Carlisle Branch at which the Benjamin Maxwell account had been opened, and reported the wire had been received and credited to the new account.

105)    The courtesy call on the PanAmerican Wire was made at 2:42 p.m., approximately 20 minutes after the wire was made and accepted.

106)    Quintana would normally make a courtesy call for a wire as he was inputting that wire only when the wire was for a frequent wire customer such as a correspondent bank or title company which the bank called so often it had that customer's telephone number on speed dial.

107)    Quintana stated four separate times in his June 22, 1995, deposition that he would normally make a courtesy call <u>after</u> a wire was input.

108)    There is no evidence to suggest that Quintana actually read the PanAmerican Wire before accepting it.

109)    There is no evidence from which to infer that Quintana actually knew that the named beneficiary and the beneficiary account number identified different persons.

110)    The PanAmerican Wire was accepted on August 3, 1994, and credited to account number 033015363, without any inference that Quintana had actual knowledge of any conflicting beneficiary information.

111)    On August 3, 1994, at the time the PanAmerican Wire was received by FSB, the CICS system could display only the account number "033015363" for the Benjamin Maxwell Jumbo CD Account.

112)    Quintana had been trained, and also acknowledged, that if he was aware of a discrepancy, he would not have paid the wire without obtaining the account holder's name and phone number from the CICS system and making a phone call to verify that the wire was expected.

113)    Quintana's training and instruction for handling incoming wires was specific.

114)    There is insufficient evidence to infer that Bobby Quintana looked at the beneficiary line of the PanAmerican Wire before accepting the wire.

115)    There is no evidence that the PanAmerican Wire received any special notice or scrutiny from Quintana before he accepted (paid) the Wire.

116)    There is no evidence to infer that the PanAmerican Wire was not accepted (paid) by Quintana within moments after it was received at FSB.

117)    There is insufficient evidence to infer that Bobby Quintana or any other FSB employee had actual knowledge of a conflict between the beneficiary name and the beneficiary account number on the PanAmerican Wire when Quintana accepted (paid) the wire.

118)    On November 29, 1994, when PanAmerican reported to FSB that Stonebanks had perpetrated a fraud, FSB immediately froze account number 033015363 and all other accounts on which Stonebanks was a signatory.

## CONCLUSIONS OF LAW

1)    This Court has jurisdiction over the parties.

2)    This Court has jurisdiction over the subject matter.

3)    The rights and liabilities of the parties with respect to the PanAmerican wire transfer are governed by Article 4A of the Uniform Commercial Code ("Article 4A"), N.M. Stat. Ann. § 55-4A-101, et seq. (Michie 1993). First Security Bank of New Mexico, N.A. v. PanAmerican Bank, 215 F.3d 1147, 1152 (10th Cir. 2000).

4)     Article 4A was crafted with the express purpose of creating inflexible rules of liability for wire transfer disputes. Id.

5)     This matter is governed by Section 207(b)(2) of Article 4A, N.M. Stat. Ann. § 55-4A-207(b)(2) (Michie 1993).

6)     FSB had no duty to determine whether the beneficiary account number designated on the PanAmerican wire identified the same beneficiary (if any) named on that wire. First Security Bank of New Mexico, N.A. v. PanAmerican Bank, 215 F.3d 1147, 1152 (10th Cir. 2000).Id.

7)     If FSB had no knowledge of a misdescription of the beneficiary of the PanAmerican wire, it could rely on the beneficiary account number designated on the PanAmerican wire as the proper identification of the beneficiary of the PanAmerican wire. Id. at 1152-1153.

8)     "Knowledge" as defined by Article 4A means actual knowledge, not constructive knowledge, and is determined at the time of payment. Id. at 1153.

9)     Payment of the PanAmerican wire occurred when FSB's employee, Quintana, credited account number 033015363 and the funds were thereby made immediately available to the holder of account number 033015363. Id. at 1159.

10)    Only "reasonable inferences" are allowed to be drawn from the evidence before this Court. Baty v. Willamette Industries, Inc., 172 F.3d 1232, 1241 (10th Cir. 1999).

11)    A party is not entitled to the benefit of unreasonable inferences, or inferences at war with undisputed facts. Schneider v. Chrysler Motors Corp., 401 F.2d 549, 555 (8th Cir. 1968)

12)    Because FSB had no knowledge of any misdescription of the beneficiary of the PanAmerican wire, acceptance of the payment order properly occurred, and FSB is not liable to PanAmerican under N.M. Stat. Ann. § 55-4A-207(b)(2).

13)    Even if FSB had knowledge that the name (if any) and number on the PanAmerican wire identify different persons, if Stonebanks, the person paid by FSB, was entitled to receive payment from PanAmerican as the originator of the PanAmerican wire, Stonebanks was entitled to be paid by FSB as the beneficiary of the PanAmerican wire. N.M. Stat. Ann. § 55-4A-207(b)(2).

14)    FSB is the prevailing party and is entitled to its costs.

GORDON S. LITTLE, P.A.

By: _____
Gordon S. Little
40 First Plaza N.W., Suite 620
Albuquerque, NM 87102
Telephone:  505-242-6888
Facsimile:  505-764-9890

-and-

RAY, QUINNEY & NEBEKER, P.A.
Scott H. Clark
John A. Adams
Douglas M. Monson
P.O. Box 45385
Salt Lake City, UT 84145-0385
Telephone: 801-532-1500
Facsimile: 801-532-7543

**Attorneys for First Security
Bank of New Mexico, N.A.**

I hereby certify that the foregoing pleading
was hand-delivered to the following counsel
of record on _February 26_____, 2001:

Robert A. Johnson, Esq.
Eastham, Johnson, Monnheimer & Jontz, P.C.
P.O. Box 1276
Albuquerque, NM 87103-1276
**Attorneys for PanAmerican Bank**

_____
Gordon S. Little