**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**



FIRST SECURITY BANK OF
NEW MEXICO, N.A.,

        Plaintiff

vs.

Cause No. CIV-94-1464  LH/WWD

PAN AMERICAN BANK; 1ST STATE
INVESTMENT CO, INC.; MATHER
FEDERAL CREDIT UNION; JOHN P.
McGOVERN FOUNDATION,

        Defendants.

**FIRST SECURITY BANK'S REVISED REQUESTED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    Plaintiff First Security Bank of New Mexico N.A. (FSB) respectfully request the Court to

adopt the following Findings of Fact and Conclusions of Law:

**REQUESTED FINDINGS OF FACT**

**A.**     **Stonebanks relationship with CIC; CIC's relationship with PanAmerican**

    1)    PanAmerican Bank and CIC had a common owner, Interbank Holding Company,

owned by the Ortega brothers, citizens of Equador.

    2)    CIC, out of about 600 transactions each month, usually only had very occasional

CD buyback requests.

    3)    During July 1994, CIC had approximately 7 CD buyback requests from

Stonebanks.

248

**B.    Origination of the PanAmerican Wire to FSB**

4)      CIC's direction to PanAmerican was for the wire to be credited to account number 03315363, the Jumbo CD Account, the account number provided to PanAmerican.

5)      CIC knew and expected that the PanAmerican Wire would be credited to Account Number 033015363.

6)      CIC incorrectly assumed, based on representations from Beatrice Stonebanks that Account Number 033015363 was an account number belonging to FSB rather than to Benjamin Maxwell.

7)      PanAmerican intended and expected that, based on CIC's wire instructions, that the $495,000.00 wire would be credited to account number 033015363 at FSB.

8)      Because PanAmerican Bank did not receive any rejection message for the wire through the fed wire system, it believed and concluded that the PanAmerican Wire was in fact deposited into the account number listed as the beneficiary.

**C.    FSB's Wire Transfer System and Procedures**

9)      FSB's procedure was to rely solely on an account number as the beneficiary if an account number was specified in the wire.

10)     FSB wire operators were trained to rely solely on the WireNet system to accept incoming wires which contain a valid account number in the beneficiary field.

11)     FSB's policy and procedure was to place the courtesy call after the incoming wire was accepted.

12)     At FSB, account numbers beginning with zero could be FSB's internal accounts as well as customer accounts.

13)     At FSB, wire department employees were not involved in determining the owner of an account number.

2

14) At FSB, account numbers with 9 digits could include both FSB's internal accounts and customer accounts.

C.   **Receipt and Acceptance of the PanAmerican Wire**

15) The PanAmerican Wire was paid (accepted) solely on the basis of the valid beneficiary account number contained in the wire.

16) There is no evidence that Quintana recognized or was aware of any conflicting beneficiary information in the PanAmerican Wire before accepting the wire.

17) According to FSB wire department procedure, Bobby Quintana's initials on the upper left hand corner of the wire indicated he processed (accepted) the PanAmerican Wire.

18) The PanAmerican Wire was accepted by FSB employee Bobby Quintana ("Quintana") without any indication that he was aware of any conflicting beneficiary information.

19) FSB procedure, and the practice of Quintana, was to make the courtesy call to a customer after the wire was accepted.

20) Bobby Quintana brought the PanAmerican Wire to Nancy Abeyta approximately 20 minutes after it had been accepted.

21) Quintana would turn in his chair, reach over, and remove wire copies from the printer.

22) On August 3, 1994, FSB received incoming wires as large as $22,000,000 including 44 wires in amounts of $500,000 or more.

23) If Quintana had recognized that a wire included First National Bank of Albuquerque as a beneficiary but also a customer savings account was a beneficiary, he would have investigated further before accepting the wire.

24) The courtesy call on the PanAmerican Wire was made at 2:42 p.m., approximately 20 minutes after the wire was accepted.

25)      Quintana would normally make a courtesy call for a wire as he was inputting that wire only when the wire was for a frequent wire customer such as a correspondent bank or title company which the bank called so often it had that customer's telephone number on speed dial.

26)      Quintana stated four separate times in his June 22, 1995, deposition that he would normally make a courtesy call _after_ a wire was input.

27)      There is no evidence to suggest that Quintana actually read the PanAmerican Wire before accepting it.

28)      There is no evidence from which to infer that Quintana actually knew that the named beneficiary and the beneficiary account number identified different persons.

29)      The PanAmerican Wire was accepted on August 3, 1994, and credited to account number 033015363, without any inference that Quintana had actual knowledge of any conflicting beneficiary information.

30)      Quintana had been trained, and also acknowledged, that if he was aware of a discrepancy, he would not have accepted the wire without obtaining the account holder's name and phone number from the CICS system and making a phone call to verify that the wire was expected.

31)      Quintana's training and instruction for handling incoming wires was specific.

32)      There is insufficient evidence to infer that Bobby Quintana looked at the beneficiary line of the PanAmerican Wire before accepting the wire.

33)      There is no evidence to infer that the PanAmerican Wire was not accepted (paid) by Quintana within moments after it was received at FSB.

34)      There is insufficient evidence to infer that Bobby Quintana or any other FSB employee had actual knowledge of a conflict between the beneficiary name and the beneficiary account number on the PanAmerican Wire when Quintana accepted (paid) the wire.

4

## CONCLUSIONS OF LAW

1)      This Court has jurisdiction over the parties.

2)      This Court has jurisdiction over the subject matter.

3)      The rights and liabilities of the parties with respect to the PanAmerican wire transfer are governed by Article 4A of the Uniform Commercial Code ("Article 4A"), N.M. Stat. Ann. § 55-4A-101, et seq. (Michie 1993). First Security Bank of New Mexico, N.A. v. PanAmerican Bank, 215 F.3d 1147, 1152 (10th Cir. 2000).

4)      Payment of the PanAmerican wire occurred when FSB's employee, Quintana, credited account number 033015363 and the funds were thereby made immediately available to the holder of account number 033015363. Id. at 1159.

5)      Because FSB had no knowledge of any misdescription of the beneficiary of the PanAmerican wire, acceptance of the payment order properly occurred, and FSB is not liable to PanAmerican under N.M. Stat. Ann. § 55-4A-207(b)(2).

6)      Even if FSB had knowledge that the name (if any) and number on the PanAmerican wire identify different persons, if Stonebanks, the person paid by FSB, was entitled to receive payment from PanAmerican as the originator of the PanAmerican wire, Stonebanks was entitled to be paid by FSB as the beneficiary of the PanAmerican wire. N.M. Stat. Ann. § 55-4A-207(b)(2).

7)      FSB is the prevailing party and is entitled to its costs.

5

GORDON S. LITTLE, P.A.

By: _____

Gordon S. Little
40 First Plaza N.W., Suite 620
Albuquerque, NM 87102
Telephone: 505-242-6888
Facsimile: 505-764-9890

-and-

RAY, QUINNEY & NEBEKER, P.A.
Scott H. Clark
John A. Adams
Douglas M. Monson
P.O. Box 45385
Salt Lake City, UT 84145-0385
Telephone: 801-532-1500
Facsimile: 801-532-7543

**Attorneys for First Security
Bank of New Mexico, N.A.**

I hereby certify that the foregoing pleading
was hand-delivered to the following counsel
of record on ___March 5___, 2001:

Robert A. Johnson, Esq.
Eastham, Johnson, Monnheimer & Jontz, P.C.
P.O. Box 1276
Albuquerque, NM 87103-1276
**Attorneys for PanAmerican Bank**

_____

Gordon S. Little