**IN THE UNITED STATES DISTRICT COURT** FILED
**FOR THE DISTRICT OF NEW MEXICO** UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

FIRST SECURITY BANK OF
NEW MEXICO, N.A.,

01 MAR -5 AM 10: 29

CLERK ALBUQUERQUE

Plaintiff

vs.                                         Cause No. CIV-94-1464  LH/WWD

PAN AMERICAN BANK; 1ST STATE
INVESTMENT CO, INC.; MATHER
FEDERAL CREDIT UNION; JOHN P.
McGOVERN FOUNDATION,

Defendants.

## JOINT FINDINGS OF FACT AND CONCLUSIONS OF LAW

First Security Bank of New Mexico, N.A. ("FSB") and PanAmerican Bank ("PanAmerican")

jointly submit their Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### Jurisdictional Facts

1)      The name First National Bank in Albuquerque was change to First Security Bank of

New Mexico, N.A effective January 1, 1994.

2)      FSB is a national banking association duly organized and existing under the laws

of the United States of America, with its principal place of business in Albuquerque, New Mexico.

3)      PanAmerican Bank is a Florida banking corporation with its principal place of

business in Miami, Florida.

4)      Beatrice Stonebanks ("Stonebanks") incorporated, and was the President of,

Benjamin Maxwell & Co. Corp. ("Benjamin Maxwell").



5)      In this action, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6)      This action is between citizens of different states.

7)      FSB commenced this action by filing a Complaint for Interpleader asserting that there were more than two adverse claimants of diverse citizenship as defined in 28 U.S.C. § 1332, who claimed to be entitled to the money in the custody or possession of FSB, or to the proceeds of the account obligation of FSB, which was the subject of the interpleader.

8)      On December 22, 1994, simultaneously with the filing of the Complaint for Interpleader, FSB deposited $305,877,12 with the Registry of this United States District Court.

9)      On March 12, 1996, this Court entered an order dismissing the interpleader and disbursing the interpleader funds. The Court's March 12, 1996, Order was approved by all parties.

10)     Except for claims explicitly dismissed by the March 12, 1996, Order, all other claims and defenses, including the counterclaims of PanAmerican, and claims by and against FSB, were preserved.

**Stonebanks relationship with CIC; CIC's relationship with PanAmerican**

11)     PanAmerican served as a custodian bank for CIC and typically executed wire transfers, such as the PanAmerican Wire, for its customer CIC.

12)     PanAmerican Bank's customer was CIC Capital.

13)     CIC was in the business of purchasing directly, or through brokers, CDs from banks or financial institutions.

14)     CIC Capital had dealt with Beatrice Stonebanks, who was the sole officer and director of Benjamin Maxwell.

2

15) Brokers such as Beatrice Stonebanks were paid commissions by CIC for finding bank CDs.

16) Stonebanks had a long existing relationship placing brokered CDs for CIC Capital ("CIC") beginning at least as early as July, 1991.

17) Stonebanks gave the Benjamin Maxwell account number to CIC as the account number to which she represented First Security Bank wished the money wired.

18) CIC had been told by Stonebanks that First National Bank of Albuquerque would issue a $495,000 Certificate of Deposit with an interest rate of 6.25%.

19) FSB had no knowledge that Stonebanks was representing that it would issue such a Certificate of Deposit and in fact, FSB had never authorized Stonebanks to do any of the things which she did.

20) Stonebanks forged a signature of a First Security Employee and gave fraudulent instructions to CIC for wiring a $495,000 amount.

21) CIC purchased from various financial institutions, at least 189 CDs brokered by Beatrice Stonebanks/Benjamin Maxwell between July 1991 and November 1994.

22) CIC required an account number in a wire transfer instruction to PanAmerican.

**Origination of the PanAmerican Wire to FSB**

23) On August 3, 1994, Stonebanks on behalf of Benjamin Maxwell opened a business savings account at FSB, to which FSB assigned account number 033015363.

24) Stonebanks titled account number 033015363:

> BENJAMIN MAXWELL & CO. CORP.
> JUMBO CD ACCOUNTS

25)     On or about August 3, 1994, Stonebanks contacted Tony Romero at CIC and

advised that Benjamin Maxwell could place (broker) for CIC certificates of deposit ("CDs") at FSB.

26)     Neither Stonebanks nor Benajamin Maxwell was ever authorized to represent FSB

in any capacity to broker or quote rates for CDs.

27)     Mr. Romero had bought thousands of CDs through brokers over the years.

28)     Beatrice Stonebanks forged a First Security Bank employee's name (Delores

Jones) on a confirmation form and furnished the wire instructions to CIC, which were as follows:

> "wire to:     First Security Bk
> formerly FNB in ABQ
> Albuquerque, NM
> aba # 1070-0027-5
> credit Jumbo CD Accounts
> Account # 033015363

29)     CIC provided wire instructions to PanAmerican Bank based upon the forged

instructions given by Stonebanks.

30)     The wire said on its face: BTR/BNF=First N.B. of Albuquerque / AC-033015363

OBI= CREDIT JUMBO CD ACCT.

31)     BTR is a Fedwire code which means that the wire transfer is a bank transfer and that

the beneficiary is a bank.

32)     BNF on such wire describes the beneficiary and ultimate party to whom the wire

transfer is to be paid.

33)     Mr. Romero estimated he had bought 50 to 100 CDs through Beatrice Stonebanks.

34)     Neither CIC nor PanAmerican attempted to contact FSB to verify any of the CD

or wire information provided by Stonebanks on behalf of Benjamin, Maxwell.

4

35)     Outgoing wire transfer instructions (payment orders) for CD purchases were made by CIC on a PanAmerican Bank form called "Request for Wireout Transfer" or "RFWT".

36)     PanAmerican's outgoing wire procedures included the specific requirement that the customer provide an account number for the wire beneficiary on the "RFWT."

37)     PanAmerican's outgoing wire procedures further included the specific requirement that its Account Officer make sure the wire request included a beneficiary account number.

38)     An outgoing wire request was not considered complete by CIC or by PanAmerican if the beneficiary account number was not included.

39)     The PanAmerican "RFWT" form contained a separate box for the Beneficiary description.

40)     CIC provide the Beneficiary information in all "RFWT" forms.

41)     CIC specified on the RFWT that the Beneficiary of the PanAmerican Wire was: "First N.B. of Albuquerque Account No. 033015363."

42)     CIC also designated in the Special Instructions section of the RFWT for the PanAmerican Wire: "To Beneficiary (BNF) Credit Jumbo CD Account."

43)     The Master Trade Account form for the PanAmerican Wire was a PanAmerican form document that was completed by CIC employees.

44)     CIC and PanAmerican believed account number 003015363 at FSB was FSB's own account but had no actual knowledge of that fact.

45)     CIC had no suspicion of improper transactions by Beatrice Stonebanks until after the date of the PanAmerican Wire.

5

## FSB's Wire Transfer System and Procedures

46)     Two separate computer systems were used in the FSB wire department.

47)     The incoming wire desk in the FSB wire department had two separate, dedicated computer terminals, one for the WireNet system, and the other for the CICS system.

48)     One computer terminal was used only to receive wire transfers used the WireNet automated software system which interfaced with Fedwire (the Federal Reserve's automated wire transfer software system).

49)     The second computer system at the incoming wire desk accessed FSB's internal customer account computer system, the "CICS" system.

50)     Incoming wires were received and accepted only using the WireNet automated wire system computer.

51)     The WireNet software makes payment of incoming wires a semi-automated system.

52)     At the moment a wire was accepted (paid) by FSB the funds are instantly credited to the beneficiary account.

53)     Only one FSB wire operator at a time received incoming wires.

54)     When an incoming wire was received by WireNet, a hard copy of the wire instructions is printed automatically.

55)     The FSB wire room had a dedicated printer which printed only copies of incoming wires and that printer was next to the incoming wire desk.

56)     When incoming wire(s) was received, an FSB employee would remove from the printer hard copy(ies) of all incoming wires then printed, and take the hard copy(ies) to his/her work station.

6

57)     Incoming wires waiting in the queue to be accepted would be displayed on the monitor by striking the "F6" key on the WireNet computer keyboard.

58)     The input operator would process waiting incoming wires in the order received.

59)     The operator who processed (accepted) the incoming wire initialed the wire copy immediately after accepting the wires.

60)     To accept (pay) an incoming wire, the wire operator would strike the "F6" key on the WireNet computer keyboard, then enter the four (4) digit department code (4200), and then strike, "F1" and "A".

61)     When the operator struck the "F6" command key the WireNet terminal displayed the next incoming wire.

62)     The operator would then type "4200" and strike the keys "F1" and "A".

63)     It took only a few seconds for the wire operator to enter those keystrokes and accept (pay) the wire.

64)     By entering "F1," WireNet, without further human interaction verifies that the beneficiary account number identified in the wire instruction matches an account number at FSB and ignores any named beneficiary.

65)     Then entering "A," if the beneficiary account number in an incoming wire was a valid FSB account number (whether an internal FSB account or customer account), the wire was instantly accepted and credited into the designated account by the WireNet software.

66)     If the beneficiary account number in the wire instruction was not a valid account number, the WireNet software displayed an error message and the wire was not automatically accepted.

7

67)     After being accepted by an input operator, each wire was reviewed by a second wire department employee to verify that the wire was credited to the beneficiary account number designated.

68)     The reviewer then initialed the wire copy.

69)     As a separate customer service, FSB would attempt to make a courtesy call to a customer to advise the customer that a wire had been received and that the funds were available in the account.

70)     Courtesy calls to FSB customers who received frequent or numerous wires were often on speed dial on its telephone system.

71)     FSB's procedure was to note the time and the person to whom to courtesy call was made.

**Receipt and Acceptance of the PanAmerican Wire**

72)     On August 3, 1994, at the time the PanAmerican Wire was received by FSB, the WireNet system verified that account number 033015363 was a valid account number.

73)     Bobby Quintana's initials on the wire indicated that he was the FSB employee who processed the wire.

74)     Quintana, although deposed, could not be found by either party for trial and his deposition was admitted as evidence.

75)     Nancy Abeyta was a supervisor in the FSB wire department on August 3, 1994.

76)     Nancy Abeyta remembered Bobby Quintana bringing a hard copy of the PanAmerican Wire to her and requesting that she make the courtesy call to notify the customer the wire had been received and accepted.

8

77)    At the time Quintana brought the PanAmerican Wire to Nancy Abeyta, it already contained his initials and a second set of initial indicating the wire had also been reviewed.

78)    On August 3, 1994, at the time the PanAmerican Wire was received by FSB, the CICS system could display only the account number "033015363" for the Benjamin Maxwell Jumbo CD Account because the account was new and no information other than the account number was available on the system until the next business day after the account was opened.

79)    If Quintana used the CICS system to look up an account number, and that system showed that the account number was new that day, that information would not cause him to question the wire.

80)    Bobby Quintana asked Nancy Abeyta to make the courtesy call because he could not locate customer contact information for the new account and could not make the courtesy call himself.

81)    Quintana's practice when inputting incoming wires was to tear off from the dedicated printer the hard copy of all wires waiting for input.

82)    It was not uncommon for numerous wires to be waiting on the printer.

83)    Quintana's desk was approximately three feet from the incoming wire printer.

84)    Quintana would not necessarily even have to stand up to reach wires on the printer.

85)    Quintana would normally make a courtesy call sometime after the wire was input.

86)    Quintana estimated that at the time of the PanAmerican Wire, FSB averaged around 180 to 230 incoming wires per day.

87)    On August 3, 1994, FSB received 162 incoming wires.

9

88)     The PanAmerican Wire was the 133rd wire received that day at 2:22:57 p.m.

89)     32 wires were received by FSB in the hour preceding the PanAmerican Wire, 17 of those wires between 2:00 p.m. and 2:22:57 p.m.

90)     There were three other incoming wires received by FSB less than one minute before the PanAmerican Wire.

91)     When Bobby Quintana brought the wire to Nancy Abeyta, Abeyta called Karen Henz, manager of the Carlisle Branch at which the Benjamin Maxwell account had been opened, and reported the wire had been received and credited to the new account.

92)     There is no evidence to infer that the PanAmerican Wire was not accepted (paid) by Quintana within moments after it was received at FSB.

93)     On November 29, 1994, when PanAmerican reported to FSB that Stonebanks had perpetrated a fraud, FSB immediately froze account number 033015363 and all other accounts on which Stonebanks was a signatory.

## CONCLUSIONS OF LAW

1)     This matter is governed by § 55-4A-207(b)(2).

2)     Article 4A was crafted with the express purpose of creating inflexible rules of liability for wire transfer disputes. Id.

3)     This matter is governed by Section 207(b)(2) of Article 4A, N.M. Stat. Ann. § 55-4A-207(b)(2) (Michie 1993).

4)     FSB had no duty to determine whether the beneficiary account number designated on the PanAmerican wire identified the same beneficiary (if any) named on that wire. First Security Bank of New Mexico, N.A. v. PanAmerican Bank, 215 F.3d 1147, 1152 (10th Cir. 2000).Id.

10

5)      If FSB had no knowledge of a misdescription of the beneficiary of the PanAmerican wire, it could rely on the beneficiary account number designated on the PanAmerican wire as the proper identification of the beneficiary of the PanAmerican wire. Id. at 1152-1153.

6)      "Knowledge" as defined by Article 4A means actual knowledge, not constructive knowledge, and is determined at the time of payment. Id. at 1153.

7)      Only "reasonable inferences" are allowed to be drawn from the evidence before this Court. Baty v. Willamette Industries, Inc., 172 F.3d 1232, 1241 (10th Cir. 1999).

8)      A party is not entitled to the benefit of unreasonable inferences, or inferences at war with undisputed facts. Schneider v. Chrysler Motors Corp., 401 F.2d 549, 555 (8th Cir. 1968)

11

GORDON S. LITTLE, P.A.

By: _____

      Gordon S. Little
      40 First Plaza N.W., Suite 620
      Albuquerque, NM  87102
      Telephone:  505-242-6888
      Facsimile:  505-764-9890

      -and-

RAY, QUINNEY & NEBEKER, P.A.
Scott H. Clark
John A. Adams
Douglas M. Monson
P.O. Box 45385
Salt Lake City, UT 84145-0385
Telephone: 801-532-1500
Facsimile: 801-532-7543
**Attorneys for First Security
Bank of New Mexico, N.A.**


EASTHAM, JOHNSON, MONNHEIMER & JONTZ, P.C.

By: _____

      Robert A. Johnson, Esq.
      P.O. Box 1276
      Albuquerque, NM 87103-1276
      **Attorneys for PanAmerican Bank**